HENDRIX & WEHAGE, LLP
Joseph A. Hendrix
500 N. State College Blvd., Suite 1100
Orange, California 92868
Telephone:     (714) 919-4440
Facsimile:     (719) 919-4450

TODD C. BANK (motion for *pro hac*
 *vice* admission pending)
TBLaw101@aol.com
119-40 Union Turnpike
Fourth Floor
Kew Gardens, New York 11415
Telephone:     (718) 520-7125
Facsimile:     (866) 698-7850

DANIEL A. OSBORN 132472
OSBORN LAW, P.C.
295 Madison Avenue, 39th Floor
New York, New York 10017
Telephone:     (212) 725-9800
Facsimile:     (212) 725-9808

*Attorneys for Objector*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

------------------------------------------------ X
                             :

IN RE GOOGLE BUZZ USER
PRIVACY LITIGATION       :

                            :
This Pleading Relates To:       :

              ALL CASES       :
                            :
------------------------------------------------ X

5:10-CV-00672-JW

Date:   January 31, 2010
Time:  9:00 a.m.
Place:  Courtroom 8, 4th Floor
         [Hon. James Ware]

**MEMORANDUM OF POINTS AND AUTHORITIES**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................ 1

STATEMENT OF THE RELEVANT FACTS ........................................................................... 1

ARGUMENT ........................................................................................................................... 1

POINT I ............................................................................................................................... 2

THE PROPOSED SETTLEMENT IS SUBJECT TO A HIGH STANDARD
OF REVIEW BECAUSE IT WAS REACHED BEFORE CLASS CERTIFICATION ........... 2

POINT II .............................................................................................................................. 2

THE USE OF *CY PRES* RELIEF IN LIEU OF PAYMENTS TO THE
PUTATIVE CLASS MEMBERS WAS IMPROPER ................................................................ 3

    A.  The Number of Class Members Has Not Been Identified ................................................. 3

    B.  The Parties Have Artificially Inflated the Size of the Class
        by Improperly Extending the Class Period ................................................................. 5

    C.  Google's Agreement to a *Cy Pres* Distribution in Exchange for the
        Waiver  of the Putative Class Members' Claims for Actual Damages is Improper........ 5

POINT III............................................................................................................................... 8

THE LAWSUITS DID NOT PROMPT GOOGLE TO MAKE ANY
CHANGES AND THUS DID NOT CONFER A BENEFIT ON THE CLASS ....................... 8

POINT IV............................................................................................................................. 11

THE PROPOSED SETTLEMENT AGREEMENT IS CONFUSING, AND
DEVOID OF DETAILS, WITH RESPECT TO THE *CY PRES* AWARD ........................... 11

POINT V ................................................................................................................ 13

THE PROPOSED SETTLEMENT AGREEMENT DOES NOT REQUIRE
GOOGLE TO DO ANYTHING CONCRETE WITH RESPECT TO ITS
PURPORTED "PUBLIC EDUCATION" PLAN ...................................................... 13

POINT VI.............................................................................................................. 15

THE CLASS NOTICE IS INVALID ...................................................................... 15

    A.   The Class Notice Did Not the Potential Value
        of the Putative Class Members' Claims ................................................. 15

    B.   The Opt-Out Instructions in the Class Notice are Confusing and Inconsistent
        With the Opt-Out Instructions in the Proposed Settlement Agreement ........................ 16

    C.   The Requirement That Objectors Provide Proof of
        Class Membership Was Unnecessarily Confusing ....................................... 19

    D.   The Class Notice Was Misleading With Respect to the Size of the Class ................... 20

POINT VII ............................................................................................................. 21

THE SETTLEMENTS IN OTHER CASES UPON WHICH
CLASS COUNSEL RELIES SUPPORT THE REJECTION
OF THE Proposed Settlement Agreement ............................................................ 21

CONCLUSION ...................................................................................................... 22

# **TABLE OF AUTHORITIES**

**Cases**

*Crawford v. Equifax Payment Servs., Inc.*,
  201 F.3d 877 (7th Cir. 2000) ............................................................................ 5

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................... 2

*Lindsay v. Government Employees Ins. Co.*,
  448 F. 3d 416 (D.C. Cir. 2006) ....................................................................... 17

*Molski v. Gleich*,
  318 F.3d 937 (9th Cir. 2003) .................................................................... passim

*Rodriguez v. West Publishing Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................................... 15

*Shaffer v. Continental Casualty Co.*,
  362 Fed. Appx. 627, 2010 U.S. App. LEXIS 726 (9th Cir. Jan. 12, 2010) ................................ 1

*Simpao v. Govt. of Guam*,
  369 Fed. Appx. 837, 2010 U.S. App. LEXIS 4765 (9th Cir. Mar. 5, 2010) ............................ 15

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ........................................................................... 7

**Statutes**

18 U.S.C. §§ 2707(c) and 2520(c)(2) .................................................................... 7

42 U.S.C. § 12101, et seq.,................................................................................. 5

**Rules**

Fed. R. Civ. P. 23(c)(2)(B)(v) ................................................................................................ 16, 17

Fed. R. Civ. P. 23(e) .................................................................................................................. 1

Federal Rule of Civil Procedure 23(d)(5) .................................................................................. 1

Federal Rules of Civil Procedure 23(a) and 23(b)(3) .............................................................. 16

Rule 23(b)(3) ...................................................................................................................... 16, 17

Rule 23(c)(2) ........................................................................................................................... 16

Putative Class Member Tanya Rudgayzer ("Rudgayzer"), by the undersigned counsel, submits this Memorandum of Points and Authorities pursuant to Federal Rule of Civil Procedure 23(d)(5), in support of her objections to the Proposed Settlement Agreement.

## INTRODUCTION

Class member/Objector Rudgayzer objects to the Proposed Settlement Agreement on several grounds.  Most notably, the proposed settlement releases claims of potentially injured class members for absolutely no consideration.  The class representatives, who have asked to be awarded $2500 each for their role in the litigation, have agreed to the breadth of such a release because they, through Class Counsel, did not find any class members who suffered actual injury. The source of the information relied upon was materials received by Google from complaining class members, none of which have been shared with the absent class members or the Court. Obviously, Google is more than willing to agree to such a release.  The Ninth Circuit, however, has rejected a similar settlement.

There are a number of other deficiencies, set forth below, that preclude this Court from finding the proposed settlement to be fair, reasonable and adequate.

## STATEMENT OF ISSUES TO BE DECIDED

Putative Class Member Rudgayzer identifies the following issue to be decided: whether the Proposed Settlement Agreement reached by the parties is fair, reasonable, and adequate.

## STATEMENT OF THE RELEVANT FACTS

On October 7, 2010, this Court preliminarily approved the Proposed Settlement Agreement. *See* Second Amended Order Preliminarily Approving Class Action Settlement ("Second Amended Order"), Doc. 50.

---

**ARGUMENT**

**POINT I**

**THE PROPOSED SETTLEMENT IS SUBJECT TO A HIGH STANDARD
OF REVIEW BECAUSE IT WAS REACHED BEFORE CLASS CERTIFICATION**

This Court is well aware that "[a] district court may approve a class action settlement 'only after a hearing and on finding that it is fair, reasonable, and adequate.'"   *Shaffer v. Continental Casualty Co.*, 362 Fed. Appx. 627, 2010 U.S. App. LEXIS 726 at *3 (9th Cir. Jan. 12, 2010), quoting Fed. R. Civ. P. 23(e).  In assessing whether a proposed class settlement is "fair, reasonable, and adequate,"

> [t]he district court must "explore[] comprehensively" relevant factors, such as: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement."

*Id.* at *3-*4, quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

The Court is also undoubtedly aware that "[a] 'higher standard of fairness' is required where . . . settlement negotiations occurred before class certification."  *Id.*; a*ccord*, *Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003).  That is the case here.  Settlement of the litigation occurred before certification.  In fact, no motion for class certification had even been filed.  This Court thus has an enhanced duty to scrutinize the proposed settlement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**POINT II**</u>

**THE USE OF *CY PRES* RELIEF IN LIEU OF PAYMENTS**
<u>**TO THE PUTATIVE CLASS MEMBERS WAS IMPROPER**</u>

**A.      The Number of Class Members Has Not Been Identified**

Curiously, no evidence has been provided to either the putative class members or this Court identifying the number of class members.  In the absence of such information, there is no way for a court to properly evaluate the proposed settlement.  That is especially the case here, where the proposed settlement involves *cy pres* relief in lieu of monetary payments.

In the Consolidated and Amended Class Action Complaint ("Complaint"), Plaintiffs allege that, "[i]n January of 2009, Gmail had 31.2 million users in the United States," Compl., Doc. 31, ¶ 40.  The Complaint cites Anthony Ha, *Zimbra Tops 40M Paid Users: More Popular Than Gmail?* (Mar. 5, 2009) (the "Zimbra article"), and notes that the Zimbra article is "available at http://venturebeat.com/2009/03/05/  zimbra-tops-40m-paid-users-more-popular-than-gmail."  *Id.*  The Zimbra article, however, did not identify the number of Gmail users.  Rather, the article stated that "Gmail received . . . 31.2 million *unique monthly visitors* . . . in the US during the month of January [2009] (according to comScore)" (emphasis added). According to Google, "Unique Visitors represents the number of unduplicated (counted only once) visitors to your website over the course of a specified time period. A Unique Visitor is determined using *cookies*."  www.google.com/support/analytics/bin/  answer.py?hl=en&answer=33087  (emphasis added).  As further explained by Google, "[a] 'cookie' is a small file containing a string of characters that is sent to your computer when you visit a website.  When you visit the website again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information."  www.google.com/privacy_faq.html#toc-terms-cookie.  Because the putative class is defined as being composed of Gmail users, the number of such users is the

relevant statistic, not the number of the Gmail website's "unique visitors." By providing only the latter figure, Class Counsel has failed to provide evidence of the actual number of putative class members, in the absence of which this Court may not approve Class Counsel's attempt to portray the class as being so large as to justify *cy pres* relief in lieu of payments to the putative class members.

Class Counsel's motion for final approval is no more helpful, relying on "industry research" for its claim that there are more than 37 million Gmail users in the US."  Motion for Final Approval, Doc. 61 at 7, to which Class Counsel cites Erick Schonfeld, Gmail Nudges Past AOL Email in the U.S. To Take No. 3 Spot, TechCrunch.com, Aug. 14, 2009 (the "Schonfeld article"), available at http://techcrunch.com/2009/08/14/gmail-nudges-past-aol-email-in-the-us-to-take-no-3-spot.  Because the Schonfeld article, just like the Zimbra article, contains only a statistic regarding unique monthly visitors, it is as unreliable as the Zimbra article.

Objector Rudgayzer acknowledges that in light of the number of "unique visitors" to Gmail, there probably is a large number of class members.  That supposition, however, is not a substitute for actual evidence, which is required.  It seems odd, given the face-to-face meeting between Class Counsel and Google's counsel, the 14-hour mediation among the parties, and the confirmatory discovery conducted by Class Counsel, that this information was not produced. Instead, Class Counsel relies upon what are essentially estimates from magazines.

The Class Notice, in defending the fact that the putative class members would receive no monetary benefits, states that "few, if any, class members suffered compensable actual damages and [] a pro rata distribution of the fund to the Class would not be feasible due to the size of the Class." Class Notice, § 7, ¶ 3 (a copy of the Class Notice is annexed hereto as Exhibit "A"). However, because no reliable evidence has been presented as to the number of class members,

"there is no evidence that proof of individual claims would be burdensome or that distribution of damages would be costly." *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003). As a result, this Court cannot properly determine whether the proposed settlement is fair, reasonable, and adequate.

**B.  The Parties Have Artificially Inflated the Size of the Class by Improperly Extending the Class Period**

The Class Notice defines the class period as February 9, 2010, *i.e.*, the date on which Google launched its Buzz program, to November 2, 2010. *See* Class Notice, § 5. However, the class period should have ended on April 5, 2010, the last date on which Google made the changes that Class Counsel cites in support of the Proposed Settlement Agreement. *See* Class Counsel's Memorandum of Points and Authorities in Support of Motion for Order Preliminarily Approving Settlement ("Class Counsel's Memorandum"), Doc. 61at 3. Indeed, nowhere does Class Counsel argue that any unlawful conduct occurred after April 5. By improperly extending the class period, the parties have unjustifiably increased the size of the class to include those individuals who became Gmail users between April 6, 2010, and November 2, 2010. As a result, Class Counsel has made it less practical to pay damages to the true class members, whatever the size of the class, than would otherwise be the case.

**C.  Google's Agreement to a *Cy Pres* Distribution in Exchange for the Waiver of the Putative Class Members' Claims for Actual Damages is Improper**

In *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003), a case that arose under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and various state laws, the Ninth Circuit reversed the District Court's approval of a proposed settlement even though it included concrete and meaningful injunctive relief (namely, numerous changes to comply with the ADA and related state laws) and  an agreement by the defendant to make donations totaling

$195,000 to eight different disability organizations in California.  *Molski*, 318 F.3d at 943-44. The settlement agreement did not provide for specific, individualized relief for each class member, and most importantly, it contained a general release on behalf of all the class members. *See id.* at 944.

Notwithstanding the putative benefits of the settlement agreement, the Ninth Circuit rejected it, explaining as follows:

> Here, the class members *lost their rights to pursue any claims* (excepting those for physical injury); the class representative received monetary relief of $5,000; and the class counsel was paid $50,000. The corporation was required to make tax-deductible donations to third parties and simply meet its legal obligations (or perhaps even less than that required) under the ADA. *See Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 881 (7th Cir. 2000) (rejecting the settlement as unfair because the named plaintiff and class counsel were paid "to go away" and "the other class members received nothing ... and lost the right to pursue class relief."). *In sum, the class members received nothing*; the named plaintiff and class counsel received compensation for his injury and their time; and the defendant escaped paying any punitive or almost any compensatory damages. *Id.* ("[A]ll the settlement does for ... [the absent class members] is cut them off at the knees.").

*Id.* at 953-954 (emphases added).

The Ninth Circuit further explained that, "[i]ntertwined with our finding that the settlement agreement was unfair is the fact that the *cy pres* award in this case replaced the claims for actual and treble damages of potentially thousands of individuals. . . . ***  We have left open the question of whether a *cy pres* award can *ever* be used as a substitute for actual damages."  *Id.* at 954 (emphasis added).  Here, although the Complaint alleged actual damages by the putative class members and their resulting entitlement to relief, *see* Compl., Doc. 31, ¶¶ 6, 43, 76, 99, 101, 104(d), the Class Notice states, as noted above, that "few, if any, Class Members suffered compensable actual damages."  Class Notice, Ex. "A," § 7, ¶ 3.  Like *Molski*, those claims are now being released, despite the fact that no evidence has been offered to either the putative class

members or this Court that would enable a determination one way or the other as to whether this assertion is correct.[1]

In contrast to the allegations in the Complaint, Class Counsel's Memorandum in support of the proposed settlement asserts that, "[o]f all consumer feedback sent to Google about Buzz, Class Counsel could identify no class members who allege that they suffered out-of-pocket damages."  Class Counsel's Memorandum, Doc. 61 at 5.  Class Counsel states that, "[i]n accordance with the terms of the June 2, 2010 term sheet, Google provided Plaintiffs' counsel with thousands of pages of documents, including all consumer feedback that it had received about the Buzz program, and declarations by Google executives concerning Buzz usage statistics, product design, and the user complaint process." Dec. of Gary E. Mason, Doc. 42, § 8. However, neither the "term sheet" nor the documents that were supposedly produced pursuant to it have been disclosed, thus precluding both the putative class members and this Court from reaching an informed conclusion regarding the issue of whether any of the members sustained actual damages. Class Counsel's statement that none of the class members sustained actual damages, based on whatever it was that was given to them by Google's counsel, is not evidence and prevents this Court from fully and properly evaluating the fairness, reasonableness and adequacy of the proposed settlement.

---

[1]     Furthermore, there was no formal discovery whatsoever in the present case, and the "discovery" that did occur was what Class Counsel called "Confirmatory Discovery," Class Counsel's Memorandum, Doc. 61 at 4, *i.e.*, discovery that Class Counsel asserts to have been conducted as "part of the settlement."  The lack of discovery was also deemed a problem in *Molski*: "This outcome is particularly problematic because *only a minimal amount of discovery occurred in this case, and the primary components of the agreement were reached prior to filing of the class action*."  *Molski*, 318 F.3d at 954.

**MEMORANDUM OF POINTS AND AUTHORITIES**

In sum, just as in *Molski*, "the cy pres award circumvents individualized proof requirements and alters the substantive rights at issue in this case" and should be rejected. *Molski*, 318 F.3d at 955.[2]

## POINT III

### THE LAWSUITS DID NOT PROMPT GOOGLE TO MAKE ANY CHANGES AND THUS DID NOT CONFER A BENEFIT ON THE CLASS

While the parties may have agreed among themselves that Google made changes to Google Buzz in response to the various lawsuits that were filed, both Class Counsel's own admission and the chronology of events tell a different story.

In Class Counsel's Memorandum under the title "Google's Response To The Privacy Concerns", Class Counsel states:

> While denying any legal liability, Google responded quickly to improve Google Buzz and to address concerns that had been raised about it. Google announced and implemented several modifications **within the first week after Buzz's release.** These changes included: (1) modifying the introductory screens to provide a more visible option for users to opt-out of the public display of their "follower" and "following" lists on their profile page; (2) improving the ease with which users could block unwanted followers; (3) moving from a system that automatically selected the people a user was "following" to an "auto-suggest" model that displayed a suggested list and made the ability to de-select individuals a user did not wish to follow more prominent and userfriendly; (4) changing the default so that users must affirmatively opt-in if they wish Buzz to connect to other publicly shared Google content (such as photo albums uploaded to Picasa); and (5) adding a Buzz tab to the Gmail settings page, through which users could control privacy and other settings relating to their Buzz account, as well as disable

---

[2]     In addition to a claim for actual damages, the Complaint sought statutory damages under 18 U.S.C. §§ 2707(c) and 2520(c)(2).  *See* Compl., Doc. 31, ¶¶ 76, 92.  In *Molski*, *supra*, the Ninth Circuit addressed the use of *cy pres* awards to resolve treble damages claims, which are analogous to statutory damages claims because they do not depend upon proof of actual damages.  *See Molski*, 318 F.3d at 954-955.  The *Molski* court noted that the Ninth Circuit had previously found that *cy pres* awards may in fact be used to resolve statutory damages claims because "concerns . . . 'about the impermissible circumvention of individual proof requirements' [a]re not at issue" with respect to claims that do not require "a showing of actual damage."  *Molski*, 318 F.3d at 954-955, quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1306 (9th Cir. 1990).  However, *Molski* rejected the *cy pres* award at issue there because, as noted in Point II(A), *supra*, no reliable evidence had been presented as to the number of class members.

their Buzz account completely if so desired.  Then, on April 5, 2010, several months after the original plaintiffs filed their case, Google presented a "confirmation page" to each Buzz user.  The page described the settings on the user's Buzz account and asked the user to confirm that the account was set up the way the user wanted, placing particular emphasis on the privacy settings for the user's account.

Class Counsel's Memorandum, Doc. 61 at 3.

Google Buzz was launched on February 9, 2010.  The first lawsuit was filed on February 17, 2010, eight days later.  By Class Counsel's own admission, Google made at least five major changes to correct complaints about Google Buzz **before any lawsuits were filed**.  Class Counsel identifies **only one change** made after the commencement of litigation, namely an April 5, 2010 change in which Google presented a "confirmation page" to each Buzz user.  That page merely described the settings on the user's Buzz account and asked the user to confirm that the account, including privacy settings, was set up the way the user wanted.  Notably, three of the five consolidated lawsuits were filed on or after April 5, 2010.  There simply is no way for those lawsuits to have influenced Google's corrective actions, all of which were accomplished no later than April 5.

The following chronology of Google's above-described changes to its Buzz program shows that these benefits were not the result of the various lawsuits:

> **(1)   modifying the introductory screens to provide a more
> visible option for users to opt-out of the public display
> of their "follower" and "following" lists on their
> profile page to provide a more visible option**

Google made this change on February 11, 2010.  *See* www.gmailblog.blogspot.com/2010/02/millions-of-buzz-users-and-improvements.html ("Google Blog Post 1").  However, that was six days *before* February 17, 2010, the latter being the date on which the Action was commenced.  *See* Dec. of Gary E. Mason, Doc. 42, § 2.

---

**MEMORANDUM OF POINTS AND AUTHORITIES**

> **(2)   improving the ease with which users could block unwanted followers**

Google made this change on February 11, 2010.  *See* Google Blog Post 1.

> **(3)   moving from a system that automatically selected the people a user was "following" to an "auto-suggest" model that displayed a suggested list and made the ability to de-select individuals a user did not wish to follow more prominent and userfriendly**

On February 13, 2010, *i.e.*, *before* the commencement of the first action, Google announced that this change would be "starting this week."  *See* www.gmailblog.blogspot.com/2010/02/  new-buzz-start-up-experience-based-on.html ("Google Blog Post 2").

> **(4)   changing the default so that users must affirmatively opt-in if they  wish Buzz to connect to other publicly shared Google content (such as photo albums uploaded to Picasa)**

Here, too, Google announced, on February 13, 2010, that this change, under which "Buzz will no longer connect your public Picasa Web Albums and Google Reader shared items automatically," would be "starting this week."  *See* Google Blog Post 2.

> **(5)   adding a Buzz tab to the Gmail settings page, through which users could control privacy and other settings relating to their Buzz account, as well as disable their Buzz account completely if so desired.**

Even the use of a "confirmation page" was introduced before the filing of the present action on February 17, 2010.  Google had announced in its posting of February 13, 2010, that, "[f]or the tens of millions of you who have already started using Buzz, over the next couple weeks we'll be showing you a similar version of this new start-up experience to give you a second chance to review and *confirm* the people you're following."   Google Blog Post 2 (emphasis added).  The only apparent change that *might* have occurred after the present litigation began is that the confirmation page allows users to "modify any of the sites you have connected

---

to Google Buzz, like Picasa, Google Reader, or Twitter."  Google Blog Post 4.  However, this posting does not indicate when this change took effect.

Furthermore, neither the putative class members nor this Court has been given any details of the supposed "additional refinements to Buzz."  On February 18, 2010, however, Google did announce that Google Blog Posts 1 and 2 had "noted some of the improvements we've made to Buzz based on some really helpful user feedback.  We've made a few other efforts to make Buzz settings easier to manage, including adding Buzz to the Google Dashboard." www.googlepublicpolicy.blogspot.com/2010/02/control-your-buzz-settings-in-google.html ("Blog Post 3").  Thus, here, too, such changes preceded the litigation.

## POINT IV

### THE PROPOSED SETTLEMENT AGREEMENT IS CONFUSING, AND DEVOID OF DETAILS, WITH RESPECT TO THE *CY PRES* AWARD

The third and final paragraph of Section 7 of the Class Notice states that "the Common Fund amounts in excess of fees, costs, expenses, and incentive awards will be distributed to organizations that advance the privacy interests of internet users such as the Class Members. The Settlement Agreement, available at www.buzzclassaction.com, describes all of the details about the proposed Settlement Agreement."  Class Notice, Exh. "A," § 7, ¶ 3.  However, the Proposed Settlement Agreement is not only alarmingly vacuous in its provision of information about such organizations; it is utterly confusing as well.

Section 3.4 of the Proposed Settlement Agreement states that "Google agrees to and shall deposit in an interest-bearing bank account established by Google the total sum of Eight Million Five Hundred Thousand Dollars ($8,500,000.00) as a Common Fund for Class Administrator fees and expenses, *cy pres* relief, class representative incentive payments, attorneys' fees, and costs. . . . The interest earned on [the $8,500,000.00] shall accrue to the benefit of the Common

Fund, and the interest shall be transferred to the cy pres recipients per subsection 3.4(d), below." Proposed Settlement Agreement, Doc. 41-1, § 3.4. First, as a non-English, non-colloquial term that is probably not even familiar to most lawyers, "*cy pres*" should have been defined (even if doing so would hardly have inured putative class members toward a favorable opinion of the Proposed Settlement Agreement).

Second, Section 3.4(b) of the Proposed Settlement Agreement states that "[t]he Parties shall mutually agree on the cy pres recipients and the amounts for each." Proposed Settlement Agreement, Doc. 41-1, § 3.4(b). However, whereas section 1.19 of the Proposed Settlement Agreement states that "'Party' or 'Parties' means Plaintiffs, *Class Members*, and Google, or each of them," Proposed Settlement Agreement, Doc. 41-1, § 1.19 (emphasis added), nothing in the Proposed Settlement Agreement, or, for that matter, in the Class Notice, provides the means by which the putative class members would be able to fulfill their role in effecting mutual agreement regarding the *cy pres* recipients. Presumably, absent class members will not have any role in selecting the *cy pres* recipients, but that is not what the Proposed Settlement Agreement says.

Third, Section 3.4(c) of the Proposed Settlement Agreement states that "[p]ayments to the cy pres recipients shall be made out of the Common Fund by the Class Action Administrator within thirty (30) Days *after* the *latest of* (1) agreement by the Parties on the cy pres recipients and amounts for each, and (2) the Settlement Date." Proposed Settlement Agreement, Doc. 41-1, § 3.4.(c) (emphasis added). Thus, the purported benefits would accrue, if at all, only *after* the final approval of the Proposed Settlement Agreement. Furthermore, there is no deadline for the "agreement by the Parties on the cy pres recipients and amounts for each," thus meaning that there is no deadline for the distribution of funds to the cy pres recipients.

---

**MEMORANDUM OF POINTS AND AUTHORITIES**

**POINT V**

**THE PROPOSED SETTLEMENT AGREEMENT DOES NOT
REQUIRE GOOGLE TO DO ANYTHING CONCRETE WITH
RESPECT TO ITS PURPORTED "PUBLIC EDUCATION" PLAN**

The Proposed Settlement Agreement states:

> Google agrees to disseminate wider public education about the privacy aspects of Google Buzz. Google agrees that it will *consider the suggestions* that it has received from Class Counsel and any other suggestions it may receive from Class Counsel on this issue within thirty (30) days *after this Settlement Agreement is executed by all Parties*. The parties agree that *Google will select and design the final content of the public education efforts in its discretion*. Google agrees that it will provide a report to Lead Class Counsel within three months after the Final Order and Judgment describing the public education efforts concerning the privacy aspects of Google Buzz that it undertook pursuant to this Settlement Agreement.

Proposed Settlement Agreement, Doc. 41-1, § 3.3 (emphases added).  *See also* Class Notice, Exh. "A," § 7, ¶ 2 ("Google *will do more* to educate users about the privacy aspects of Google Buzz. Google will *consider the recommendations* of Plaintiffs about the content of that public education. Google will select and design the final content of the public education efforts in its discretion, and will provide a report to Plaintiffs' lead lawyer of the education undertaken.") (emphases added). One could hardly imagine a more empty and vague provision.  First, "Google agrees that it will consider the suggestions that it has received from Class Counsel," but the Parties neglect to disclose what these suggestions might be, thereby making it impossible for either the putative class members or this Court to determine whether these suggestions would, if adopted, provide any benefit to the class.

Second, by providing that "Google will consider the recommendations of *Plaintiffs*," Class Notice, Exh. "A," § 7, ¶ 2 (emphasis added), there is clearly no right of putative class members to make suggestions, as the Proposed Settlement Agreement states that "'Plaintiffs' means the named Plaintiffs in the Action."  Proposed Settlement Agreement, Doc. 41-1, § 1.21. If the Parties were serious about having Google consider suggestions concerning the "disseminat[ion] [of] wider public education about the privacy aspects of Google Buzz,"

_____

Proposed Settlement Agreement, Doc. 41-1, § 3.3, one would think that suggestions from the putative class members would be welcome, by being made either directly to Google (which probably knows a thing or two about setting up a web page for the purpose) or, at a minimum, through Class Counsel.

Third, even if such suggestions would benefit the class, Google's compliance with this provision depends only on its *consideration* of these suggestions. Given that, according to this portion of the provision, Class Counsel has already made some suggestions, it certainly would have been helpful if Google had *already* agreed to any of these suggestions, thereby enabling the Court to determine whether there would be any benefit to the class.   Alas, while it is grammatically unclear whether the "thirty (30) days after this Settlement Agreement," Proposed Settlement Agreement, Doc. 41-1, § 3.3, is the period during which Google is to *consider* such suggestions along with "any other suggestions it may receive from Class Counsel on this issue," *id.*, or whether the thirty-day period is merely the period during which "any other suggestions it may receive from Class Counsel on this issue," *id.*, must be *made*, any potential benefits to the class would, in either case, be known only *after* final approval of the Proposed Settlement Agreement. Of course, if "thirty (30) days after this Settlement Agreement" is the date by which "any other suggestions it may receive from Class Counsel on this issue" must be made, then apparently there is not even a deadline by which Google must "consider" such suggestions.

Fourth, Section 3.3 of the Proposed Settlement Agreement, consistent with its failure to require anything concrete on Google's part, states that "[t]he parties agree that Google will select and design the final content of the public education efforts in its discretion."   Proposed Settlement Agreement, Doc. 41-1, § 3.3.   Once again, the Parties are, in essence, asking the putative class members and this Court to "trust us," but such a request hardly warrants approval of the Proposed Settlement Agreement.

Finally, the "report to Lead Class Counsel within three months after the Final Order and Judgment describing the public education efforts concerning the privacy aspects of Google Buzz

that it undertook pursuant to this Settlement Agreement," Proposed Settlement Agreement, Doc. 41-1, § 3.3, is, like the rest of Section 3.3, operable only *after* final approval of the Proposed Settlement Agreement. Further reflecting the deficiency of Section 3.3 is the lack of any agreement to inform the putative class members of those efforts, which could have easily been done, for example, through the Google Buzz web page.

## POINT VI

## THE CLASS NOTICE IS INVALID

**A.**     **The Class Notice Did Not the Potential Value**
                **of the Putative Class Members' Claims**

In deciding whether to approve of the Proposed Settlement Agreement, this Court need not "specifically weigh[] the merits of the class's case against the settlement amount and quantif[y] the expected value of fully litigating the matter," *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  However, "the estimated recovery ranges by both parties and their experts" should have been provided to the Court.  *Id.* at 966.  *Accord*, *Simpao v. Govt. of Guam*, 369 Fed. Appx. 837, 2010 U.S. App. LEXIS 4765 at *6 (9th Cir. Mar. 5, 2010). *See also Rodriguez*, 563 F.3d at 965-966 ("one factor 'that may bear on review of a settlement' is 'the advantages of the proposed settlement versus the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members,'" quoting Federal Judicial Center, *Manual for Complex Litigation*, § 21.62, at 316 (4th ed.2004)).  Of course, such information should also have been disclosed to the putative class members so as to enable them to consider the potential recovery that they would be waiving if they remain in the class and/or do not object to the proposed settlement.  Here, this information was not disclosed, not even the potential statutory damages, thereby preventing the putative class

members and this Court from properly weighting the merits of the Proposed Settlement Agreement.

**B.      The Opt-Out Instructions in the Class Notice are Confusing and Inconsistent With the Opt-Out Instructions in the Proposed Settlement Agreement**

The Class Notice and the Proposed Settlement Agreement are materially inconsistent with one another with respect to opt-out instructions. First, the Class Notice required opt-out requests to be in the form of "a letter or other written document," Class Notice, Exh. "A," § 11. However, the Proposed Settlement Agreement not only omits this requirement but states that opt-out requests "must be signed by the Class Member under penalty of perjury."  Proposed Settlement Agreement, Doc. 61, § 6.2.

Second, the Class Notice required a putative class member to "mail your request for exclusion so that it is *received* no later than December 6, 2010," Class Notice, Exh. "A," § 11 (emphasis added), while the Proposed Settlement Agreement states that "[t]he request must be *postmarked* on or before the Opt-Out Deadline."  Proposed Settlement Agreement, Doc. 61, § 6.2 (emphasis added).  Thus, putative class members who relied upon the accuracy of the Class Notice would likely have refrained from opting out if they believed that their request would not be received by December 6, 2010, when, in fact, opt-out requests were only required to be *postmarked* by that date.

A third discrepancy between the Settlement Agreement and the Class Notice is that only the latter required that an opt-out request include the "reason why you want out [sic] of the Settlement."  Class Notice, Exh. "A," § 11.  Putative class members might have been confused as to how to explain why they wished to opt out of the class; and, more importantly, such a requirement is improper.  In the Second Amended Order Preliminarily Approving Class Action Settlement ("Second Amended Order"), this Court ordered that, "[p]ursuant to Federal Rules of

Civil Procedure 23(a) and *23(b)(3)*, the proposed Class is hereby preliminarily certified for Settlement purposes only."  Second Amended Order, Doc. 50, ¶ 3 (emphasis added).  As the Ninth Circuit has recognized, "notice for a Rule 23(b)(3) class must fulfill the stringent requirements of Rule 23(c)(2)."  *Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003). Rule 23(c)(2), in turn, provides that "[t]he notice must clearly and concisely state in plain, easily understood language . . . that the court will exclude from the class *any member who requests exclusion*."  Fed. R. Civ. P. 23(c)(2)(B)(v) (emphasis added).  Thus, the Class Notice's addition of a requirement that putative class members explain their *reasons* for opting out of the class violates the plain language of Rule 23(c)(2)(B)(v).

Furthermore, "[c]ertification pursuant to Rule 23(b)(3) [] comes with certain procedural requirements: Because members of a class seeking substantial monetary damages may have divergent interests, due process requires that putative class members receive notice and an opportunity to opt out."  *Lindsay v. Government Employees Ins. Co.*, 448 F. 3d 416, 420 (D.C. Cir. 2006) (citation and quotation marks omitted).  *See also Molski*, 318 F.3d at 949 (suggesting that there is a due-process right to opt out of a class where monetary damages are involved and are more than merely incidental to the litigation).  Thus, the Class Notice's requirement that putative class members explain their reasons for opting out of the class violates the members' due-process rights.

A fourth discrepancy between the Settlement Agreement and the Class Notice is that only the latter requires "proof that you used Gmail at some point after February 9, 2010," Class Notice, Exh. "A," § 11; that is, proof of class membership.  In addition, the "proof" requirement is substantively troubling for several reasons.  First, and rather oddly in light of the nature of this action, neither "Gmail" nor "Gmail user" is defined in either the Class Notice or the Proposed

_____

17

**MEMORANDUM OF POINTS AND AUTHORITIES**

Settlement Agreement, thus leaving putative class members to wonder whether being a "Gmail user" means that one, during the class period, merely possesses a Gmail address, visits www.gmail.com, logs onto their Gmail account, or sends or receives e-mail through his Gmail address.  In addition, the Class Notice gives no indication of what constitutes the required "proof."  Is the mere listing of one's Gmail address sufficient?  Must one who wishes to opt out include a copy of an e-mail that he sent or received?  Given that Google would, of course, have all of the records regarding Gmail accounts, one should, at most, have been required to provide his Gmail address (which, in turn, should have been redacted before it was filed and thus made publicly accessible on Pacer), and, if necessary, that he either sent or received e-mail using his Gmail address during the class period, assuming that such use of a Gmail address during the class period causes one to be a putative class member.

A class notice that is inconsistent with a Proposed Settlement Agreement is invalid.  In *Molski*, *supra*, the Proposed Settlement Agreement contained a release of all claims except for those involving *physical* injury.  *See Molski*, 318 F.3d at 952.  The class notice, on the other hand, stated that the settlement agreement "'does not affect the [class members'] rights . . . with respect to *personal* injury actions.'"  *Id.* (emphasis added).  Accordingly, the court pointed out that, under the settlement agreement, "[t]he term 'personal injury' includes claims of emotional distress."  *Id.*  Thus, the class notice suggested that putative class members' claims for emotional distress were *not* being released when, by contrast, the proposed settlement had sought to release such claims.  As a result, the court found that the class notice, "by failing to explain that only claims involving literally physical injuries were not released under the proposed consent decree, [] misled the putative class members."  *Id.*

In view of the lack of clarity of the Class Notice and the inconsistencies between the Class Notice and the Proposed Settlement Agreement, it is little wonder that so few opt-out requests have been received because these deficiencies almost surely led some putative class members to refrain from exercising their rights to opt out of the class, it is substantially likely that this Court has not been fully able to consider "the reaction of the class members to the proposed settlement," *Shaffer v. Continental Casualty Co.*, 362 Fed. Appx. 627, 2010 U.S. App. LEXIS 726 at *4 (9th Cir. Jan. 12, 2010) (citation and quotation marks omitted), which is one of the factors that bears on approval of a proposed class settlement.

In sum, the various confusing instructions in the Class Notice, and the inconsistencies between the Class Notice and the Proposed Settlement Agreement, render the Class Notice invalid.

**C.     The Requirement That Objectors Provide Proof of Class Membership Was Unnecessarily Confusing**

Similar confusion to that which has likely arisen in connection with the "proof" requirement imposed upon opt-out seekers, *see* Point VI, *supra*, would have even been more likely to arise with respect to objectors, who were required to provide "proof that you are a class member." Class Notice, Exh. "A," § 14. Whereas "proof that [a person wishing to opt out] used Gmail at some point after February 9, 2010," Class Notice, Exh. "A," § 11, is confusing enough, "proof that [an objector is] a class member" is not only confusing, but is unnecessarily so.  The Class Notice states that "the Class includes all Gmail users in the United States who were presented with the opportunity to use Google Buzz before November 2, 2010."  Class Notice, Exh. "A," § 5. *Accord*, Proposed Settlement Agreement, Doc. 61, § 1.3.  Thus, a putative class member who wished to object to the Proposed Settlement Agreement would need to prove that he was "presented with the opportunity to use Google Buzz before November 2, 2010."

However, mere possession of a Gmail address during the class period *automatically* caused one to be "presented with the opportunity to use Google Buzz," because the Buzz program was offered to *everyone* who possessed a Gmail address. *See* www.gmailblog.blogspot.com/2010/02/google-buzz-in-gmail.html (Feb. 9, 2010) ("Google Introductory Blog Post") ("[t]oday, we're launching Google Buzz, a new way to start conversations about the things you find interesting and share updates, photos, videos and more. Buzz is built right into Gmail, so there's nothing to set up — you're automatically following the people you email and chat with the most. . . . ***  We'll be rolling out Google Buzz to everyone over the next few days.").

Because possession of a Gmail address and the opportunity to use the Buzz program went hand in hand, an objector should, at most, have been required to prove that he was a Gmail user.

**D.   The Class Notice Was Misleading With Respect to the Size of the Class**

The Class Notice states that, "[t]he *Court* decided that the Class includes all Gmail users in the United States who were presented with the opportunity to use Google Buzz before November 2, 2010."  Class Notice, Exh. "A," § 5 (emphasis added).  This statement clearly suggests that the matter of class size has been ruled upon and is therefore not subject to objection, when that is not so. *See* Point II(B), *supra*.  Thus, to the extent that putative class members might have objected to the size of the class, they have likely been misled into refraining from making that important objection.

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### POINT VII

### THE SETTLEMENTS IN OTHER CASES UPON
### WHICH CLASS COUNSEL RELIES SUPPORT THE
### REJECTION OF THE PROPOSED SETTLEMENT AGREEMENT

Class Counsel's Memorandum contends that "[t]his package of settlement benefits compares favorably to settlements in other cases concerning alleged privacy violations that did not involve significant actual damages," Class Counsel's Memorandum, Doc. 61 USE NEW41 at 12, citing, *inter alia*, *Lane v. Facebook, Inc.*, No. 08-cv-3845 RS (N.D. Cal. 2009), in which the total payment was $9.5 million. However, *Lane*, rather than supporting the approval of the Proposed Settlement Agreement, shows why it should be rejected. Neither the class notice nor the settlement agreement in *Lane* contained either the lack of information, or the significant confusion, regarding the terms of the settlement. Thus, unlike in the present case, both the class members in *Lane*, as well as the District Court, were provided with a sufficient and clear description of the settlement terms, thereby enabling the class members and the court to informatively weight the merits of the Proposed Settlement Agreement. This simply is not so in the present case.

Another key distinction between *Lane* and the present case is that, in *Lane*, the benefits of the settlement agreement were perfectly clear. First, the "Facebook Beacon" program, which was the subject of *Lane*, was terminated as a result of that action. *See Lane* Class Notice, § I.B, § 1.F, and *Lane* Settlement Agreement, § IV(G), ¶ 4.23 (copies of the *Lane* Class Notice and *Lane* Settlement Agreement are annexed hereto as Exhibits "B" and "C," respectively). Second, unlike the parties in the current case, the parties in *Lane* did not seek to decide how to handle *cy pres* relief *after* final approval of the settlement agreement. On the contrary, the class notice and

---

the settlement agreement provided specific terms regarding the *cy pres* relief, in particular naming the organization that was to receive the *cy pres* award.

Finally, Class Counsel also claims that the Proposed Settlement Agreement "compares favorably to [the] settlements" in *In re DoubleClick, Inc. Privacy Litig.*, No. 00 Civ 0641 (S.D.N.Y. 2001), and *DSeLise v. Farenheit Entertainment*, Civ. Act. No. CV-014297 (Cal. Sup. Ct. Marin Co. Sept. 2001). Class Counsel's Memorandum, Doc. 41 at 12. Class Counsel notes that, in *DoubleClick*, "[the] [d]efendant, an Internet ad-serving company, revised its notice, choice and data collection practices and conducted a privacy-oriented public information campaign," *id.*, while, in *DSeLise*, "sellers of interactive music CD updated privacy policies, added warning labels to CDs, and purged previously collected data." *Id.* If the changes that Google made to the Buzz program were a result of the present action, Class Counsel's comparison to *Lane*, *DoubleClick*, and *DseLise* might have been justified. However, that reliance is, in fact, wholly unjustified, as set forth in Point III, *supra*.

## **CONCLUSION**

Based upon the foregoing, Putative Class Member Tanya Rudgayzer respectfully requests that this Court deny final approval of the Proposed Settlement Agreement.

Dated: January 10, 2011

HENDRIX & WEHAGE, LLP

/s/ Joseph A. Hendrix
Joseph A. Hendrix
500 N. State College Blvd., Suite 1100
Orange, California 92868
Telephone:    (714) 919-4440
Facsimile:    (719) 919-4450

- and-

1
2          DANIEL A. OSBORN
           OSBORN LAW, P.C.
3          295 Madison Avenue, 39th Floor
           New York, New York 10017
4          Telephone:     (212) 725-9800
           Facsimile:     (212) 725-9808
5
6                          - and-
7          TODD C. BANK (motion for *pro hac*
8            *vice* admission pending)
           TBLaw101@aol.com
9          119-40 Union Turnpike
           Fourth Floor
10         Kew Gardens, New York 11415
           Telephone:     (718) 520-7125
11         Facsimile:     (866) 698-7850
12
13         *Attorneys for Objector*
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of January, 2011, a true and correct copy of the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES** will be filed and served via the Court's electronic filing and transmission system and has been served via electronic mail to the following attorneys:

Gary Mason, Esq.
Mason LLP
1625 Massachusetts Ave., NW
Suite 605
Washington, DC 20036
gmason@masonlawdc.com


David J. Burman, Esq.
Perkins Coie LLP
1201 Third Avenue
Suite 4800
Seattle, WA 98101-3099
dburman@perkinscoie.com



<u>s/ Daniel A. Osborn</u>